# EXHIBIT A

FILED
10/21/2021
Timothy W Fitzgerald
Spokane County Clerk

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**SUPERIOR COURT OF WASHINGTON FOR SPOKANE COUNTY**

MARY BELSBY, as Personal Representative
of the Estate of SHELL BELSBY

       Plaintiff,

v.

CHEVRON U.S.A., INC.; CHEVRON
PHILLIPS CHEMICAL COMPANY LP;
ST. JOHN HARDWARE & IMPLEMENT
CO., INC.; SYNGENTA CROP
PROTECTION, LLC; and SYNGENTA
AG;

       Defendants.

NO. 21-2-03049-32

**COMPLAINT FOR DAMAGES
FOR PERSONAL INJURIES AND
WRONGFUL DEATH AND
DEMAND FOR JURY TRIAL**

COMES NOW Plaintiff Mary Belsby, in her capacity as Personal Representative of the Estate of Shell Belsby, by and through her undersigned attorneys, and files this, Plaintiff's Complaint for Damages and Demand for Jury Trial, against Defendants CHEVRON U.S.A., INC.; CHEVRON PHILLIPS CHEMICAL COMPANY LP; ST. JOHN HARDWARE & IMPLEMENT CO., INC.; SYNGENTA CROP PROTECTION, LLC; and SYNGENTA AG, and alleges the following:

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 1

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-4311 - FACSIMILE (509) 328-8505

1.      Paraquat is a synthetic chemical compound[1] that since the mid-1960s has been developed, registered, manufactured, distributed, sold for use, and used as an active ingredient in herbicide products ("paraquat") developed, registered, formulated, distributed, and sold for use in the United States, including the State of Washington.

2.      Defendants are companies and successors-in-interest to companies that since 1964 have manufactured, distributed, and sold paraquat for use in Washington, acted in concert with others who manufactured, distributed, and sold paraquat for use in Washington, or sold and used paraquat in Washington.

3.      Plaintiff Mary Belsby, in her capacity as Personal Representative for the Estate of Shell Belsby, brings this suit against Defendants to recover damages for personal injuries and for wrongful death resulting from Shell Belsby's exposure to paraquat over many years.

## I.      PARTIES

4.      Plaintiff Mary Belsby has been appointed the Personal Representative of the Estate of Shell Belsby by order of the Spokane County Superior Court.  Plaintiff brings this action on behalf of the Estate and the Estate's beneficiaries for the survival claim and wrongful death of Shell Belsby pursuant to RCW 4.20 *et seq.*

5.      At all relevant times prior to his death, Shell Belsby resided in Spokane, Washington.

6.      Defendants and/or their predecessors-in-interest are corporations that, at times relevant herein, manufactured, sold, supplied, specified, required, utilized, and/or distributed paraquat[2] and/or paraquat-containing products.

---

[1]      Paraquat dichloride (EPA Pesticide Chemical Code 061601) or paraquat methosulfate (EPA Pesticide Chemical Code 061602).

[2]      Unless the context indicates otherwise, references in this complaint to "paraquat" include the chemical compound paraquat dichloride and formulated herbicide products containing paraquat dichloride as an active ingredient.

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 2

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON  99201
(509) 252-4311 - FACSIMILE (509) 328-8205

EXHIBIT A
Page 23

1      7.     Defendant Chevron U.S.A., Inc., ("Chevron USA") is a for-profit company with its

2  principal place of business located in San Ramon, California. It and/or its predecessor-in-interest, at

3  times relevant herein, sold, supplied, and/or distributed defective and unreasonably dangerous

4  paraquat products in Washington, where Shell Belsby worked with and/or around said products.

5  Defendant Chevron USA may be served with process through its registered agent, The Prentice-Hall

6  Corporation System, Inc., 300 Deschutes Way SW, Ste 208, Mc-CSC1, Tumwater, Washington

7  98501.

8      8.     Defendant Chevron Phillips Chemical Company LP ("CP Chemical") is a for-profit

9  company with its principal place of business located in The Woodlands, Texas. It and/or its

10  predecessor-in-interest, at times relevant herein, sold, supplied, and/or distributed defective and

11  unreasonably dangerous paraquat products in Washington, where Shell Belsby worked with and/or

12  around said products. Defendant CP Chemical may be served with process through its registered

13  agent, C T Corporation System, 711 Capitol Way S., Ste. 204, Olympia, Washington 98501.

14      9.     St. John Hardware & Implement Co., Inc. is a Washington for-profit company that,

15  at times relevant herein, sold, supplied, and/or distributed defective and unreasonably dangerous

16  paraquat products in Washington, where Shell Belsby worked with and/or around said products.

17  Defendant St. John Hardware & Implement Co., Inc. may be served through its registered agent, Jo

18  Hennessy, 102 N. 1st St., Fairfield, WA, 99012.

19      10.    Syngenta Crop Protection, LLC ("SCPLLC") is a for-profit company with its

20  principal place of business located in Greensboro, North Carolina. It and/or its predecessors in

21  interest, at times relevant herein, sold, supplied, and/or distributed defective and unreasonably

22  dangerous paraquat products in Washington, where Shell Belsby worked with and/or around said

23  products. Defendant Syngenta Crop Protection, LLC may be served with process through its

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 3

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-4311 - FACSIMILE (509) 328-8205

EXHIBIT A
Page 24

1    registered agent, C T Corporation System, 711 Capitol Way S, Ste. 204, Olympia, Washington

2    98501.

3        11.    Syngenta AG ("SAG") is a foreign corporation with its principal place of business

4    in Basel, Switzerland. As described in more detail below, SAG is a management holding company

5    that owns stock or other ownership interests, either directly or indirectly, in other Syngenta Group

6    companies, including SCPLLC. It and/or its predecessors in interest, at times relevant herein, sold,

7    supplied, and/or distributed defective and unreasonably dangerous paraquat products in Washington,

8    where Shell Belsby worked with and/or around said products.

9            **II.    PERSONAL JURISDICTION & VENUE**

10       12.    Shell Belsby was exposed to paraquat-containing products in the state of

11    Washington due to Defendants' tortious actions.  Defendants are corporations or other business

12    entities organized under the laws of the various states of the United States, including the State of

13    Washington, that were and/or are doing business in the State of Washington and/or were

14    participating in a concert-of-action that was or is located or conducted in or through Washington

15    and/or had effects in Washington, including, but not limited to, the violation within the state of its

16    laws and regulations.

17       13.    The Court has general jurisdiction over Defendant St. John Hardware & Implement

18    Co., Inc. because it is incorporated in Washington and has its principal place of business in

19    Washington.

20       14.    The Court has specific jurisdiction over the remaining Defendants because they

21    each (1) purposefully performed acts or consummated transactions in Washington, including

22    business directly related to Plaintiff's allegations herein; (2) Plaintiff's cause of action arises out

23    of and/or relates to Defendants' activities and/or transactions in Washington; and/or Defendants

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 4

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON  99201
(509) 252-4311 - FACSIMILE (509) 326-6205

1  committed a tortious act that caused or contributed to Shell Belsby's exposure to paraquat in

2  Washington; (3) said activities or transactions were directed in whole or in part toward the state;

3  and (4) assumption of jurisdiction over such out-of-state defendants by this Court does not offend

4  traditional notions of fair play and substantial justice.

5      15.    Furthermore, each Defendant: (A) (1) regularly does or solicits (and/or during the

6  relevant time period, did or solicited) business; (2) engages (and/or during the relevant time period

7  engaged) in one or more other persistent courses of conduct, including conduct related to Plaintiff's

8  allegations herein; and/or (3) derives (and/or during the relevant time period derived) substantial

9  revenue from goods used or consumed or services rendered in the state, including from products

10  and/or services at issue herein; and/or (B) expected or should reasonably have expected (and/or

11  during the relevant time period expected or should have reasonably expected) its acts to have

12  consequence in Washington and derives (and/or during the relevant time period derived)

13  substantial revenue from interstate or international commerce.

14      16.    Venue is appropriate in Spokane County pursuant to RCW 4.12.020 and 4.12.025

15  because certain Defendants reside in Spokane County, Washington; currently transact business in

16  Spokane County; and/or transacted business at the time the cause of action arose in Spokane

17  County. For example, Defendants Chevron USA and/or CP Chemical currently own and/or

18  operate multiple filling stations in Spokane County.

19                        **III.    FACTS**

20  **A.    Defendants and Their Corporate Predecessors**

21      **1.    Syngenta Entities**

22      17.    In 1926, four British chemical companies merged to create the British company

23  that then was known as Imperial Chemical Industries Ltd. and ultimately was known as Imperial

Chemical Industries PLC ("ICI"). In or about 1971, ICI created or acquired a wholly owned U.S.

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 5

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON  99201
(509) 252-4311 - FACSIMILE (509) 328-8205

1    subsidiary organized under the laws of the State of Delaware, which at various times was known

2    as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States

3    Inc., and ultimately was known as ICI Americas Inc. (collectively, "ICI Americas"). In or about

4    1992, ICI merged its pharmaceuticals, agrochemicals, and specialty chemicals businesses,

5    including the agrochemicals business it had operated at one time through a wholly owned British

6    subsidiary known as Plant Protection Ltd. and later as a division within ICI, into a wholly owned

7    British subsidiary known as ICI Bioscience Ltd. In 1993, ICI demerged its pharmaceuticals,

8    agrochemicals, and specialty chemicals businesses, from which it created the Zeneca Group, with

9    the British company Zeneca Group PLC as its ultimate parent company.

10        18.    As a result of ICI's demerger and creation of the Zeneca Group, ICI Bioscience

11    Ltd. was demerged from ICI and merged into, renamed, or continued its business under the same

12    or similar ownership and management as Zeneca Ltd., a wholly owned British subsidiary of

13    Zeneca Group PLC. Before ICI's demerger and creation of the Zeneca Group, ICI had a Central

14    Toxicology Laboratory that performed and hired others to perform health and safety studies that

15    were submitted to the U.S. Department of Agriculture ("USDA") and the U.S. Environmental

16    Protection Agency ("EPA") to secure and maintain the registration of paraquat and other pesticides

17    for use in the United States.

18        19.    As a result of ICI's demerger and creation of the Zeneca Group, ICI's Central

19    Toxicology Laboratory became Zeneca Ltd.'s Central Toxicology Laboratory. After ICI's

20    demerger and creation of the Zeneca Group, Zeneca Ltd.'s Central Toxicology Laboratory

21    continued to perform and hire others to perform health and safety studies that were submitted to

22    EPA to secure and maintain the registration of paraquat and other pesticides for use in the United

23    States. As a result of ICI's demerger and creation of the Zeneca Group, ICI Americas was

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 6

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #283
SPOKANE, WASHINGTON 99201
(509) 252-4311 - FACSIMILE (509) 328-6205

1  demerged from ICI and merged into, renamed, or continued its business under the same or similar

2  ownership and management as Zeneca, Inc. ("Zeneca"), a wholly owned subsidiary of Zeneca

3  Group PLC organized under the laws of the State of Delaware.

4      20.    In 1996, the Swiss pharmaceutical and chemical companies Ciba-Geigy Ltd. and

5  Sandoz AG merged to create the Novartis Group, with the Swiss company Novartis AG as the

6  ultimate parent company.  As a result of the merger that created the Novartis Group, Ciba-Geigy

7  Corporation, a wholly owned subsidiary of Ciba-Geigy Ltd. organized under the laws of the State

8  of New York, was merged into, or continued its business under the same or similar ownership and

9  management as Novartis Crop Protection, Inc. ("NCPI"), a wholly owned subsidiary of Novartis

10  AG organized under the laws of the State of Delaware.

11      21.    In 1999, the Swedish pharmaceutical company Astra AB merged with Zeneca

12  Group PLC to create the British company AstraZeneca PLC, of which Zeneca Ltd. and Zeneca

13  were wholly owned subsidiaries.  In 2000, Novartis AG and AstraZeneca PLC spun off and merged

14  the Novartis Group's crop protection and seeds businesses and AstraZeneca's agrochemicals

15  business to create the Syngenta Group, a global group of companies focused solely on

16  agribusiness, with Defendant SAG as the ultimate parent company.

17      22.    As a result of the Novartis/AstraZeneca spinoff and merger that created the

18  Syngenta Group, Zeneca Ltd. was merged into, renamed, or continued its business under the same

19  or similar ownership and management as Syngenta Ltd., a wholly owned British subsidiary of

20  SAG; and Zeneca Ltd.'s Central Toxicology Laboratory became Syngenta Ltd.'s Central

21  Toxicology Laboratory.  Since the Novartis/AstraZeneca spinoff and merger that created the

22  Syngenta Group, Syngenta Ltd.'s Central Toxicology Laboratory has continued to perform and

23

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 7

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-4311 • FACSIMILE (509) 228-8205

EXHIBIT A
Page 28

1  hire others to perform health and safety studies for submission to the EPA to secure and maintain

2  the registration of paraquat and other pesticides for use in the United States.

3       23.     As a result of the Novartis/AstraZeneca spinoff and merger that created the

4  Syngenta Group, NCPI and Zeneca were merged into and renamed, or continued to do their

5  business under the same or similar ownership and management, as Syngenta Crop Protection, Inc.

6  ("SCPI"), a wholly owned subsidiary of SAG organized under the laws of the State of Delaware.

7  In 2010, SCPI was converted into Defendant SCPLLC, a wholly owned subsidiary of SAG

8  organized and existing under the laws of the State of Delaware with its principal place of business

9  in Greensboro, North Carolina.

10      24.     As a result of these various transactions, discussed *supra*:

11      • SAG is a successor by merger or continuation of business to its corporate
          predecessor Novartis AG;

12
        • SAG is a successor by merger or continuation of business to its corporate
13        predecessor AstraZeneca PLC;

14      • SAG is a successor by merger or continuation of business to its corporate
          predecessor Zeneca Group PLC;
15
        • SAG is a successor by merger or continuation of business to its corporate
16        predecessor Imperial Chemical Industries PLC, previously known as Imperial
          Chemical Industries Ltd.;
17
        • SAG is a successor by merger or continuation of business to its corporate
18        predecessor ICI Bioscience Ltd.; and

19      • SAG is a successor by merger or continuation of business to its corporate
          predecessor Plant Protection Ltd.
20
21      25.     Additionally, as a result of these various transactions, discussed *supra*:

22      • SCPLLC is a successor by merger or continuation of business to its corporate
          predecessor SCPI;

23      • SCPLLC is a successor by merger or continuation of business to its corporate
          predecessor NCPI;

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 8

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-0311 · FACSIMILE (509) 328-8205

EXHIBIT A
Page 29

- SCPLLC is a successor by merger or continuation of business to its corporate predecessor Ciba-Geigy Corporation;

- SCPLLC is a successor by merger or continuation of business to its corporate predecessor Zeneca Inc.; and

- SCPLLC is a successor by merger or continuation of business to its corporate predecessor ICI Americas Inc., previously known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc.

26.    SCPLLC is registered to do business in the State of Washington, and SCPLLC does substantial business in the State of Washington, including the following:

a.    markets, advertises, distributes, sells, and delivers paraquat and other pesticides to distributors, dealers, applicators, and farmers in the State of Washington;

b.    secures and maintains the registration of paraquat and other pesticides with the EPA and the Washington Department of Agriculture to enable itself and others to manufacture, distribute, sell, and use these products in the State of Washington; and

c.    performs, hires others to perform, and funds or otherwise sponsors or otherwise funds the testing of pesticides in the State of Washington.

27.    SAG is a foreign corporation organized and existing under the laws of Switzerland, with its principal place of business in Basel, Switzerland. SAG is a holding company that owns stock or other ownership interests, either directly or indirectly, in other Syngenta Group companies, including SCPLLC. SAG is a management holding company.

28.    Syngenta Crop Protection AG ("SCPAG"), a Swiss corporation with its principal place of business in Basel, Switzerland, is one of SAG's direct, wholly owned subsidiaries. SCPAG employs the global operational managers of production, distribution, and marketing for the Syngenta Group's Crop Protection ("CP") and Seeds Divisions. The Syngenta Group's CP and Seeds Divisions are the business units through which SAG manages its CP and Seeds product lines. The Syngenta Group's CP and Seeds Divisions are not and have never been corporations or other legal entities.

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 9

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #785
SPOKANE, WASHINGTON 99201
(509) 252-4311 - FACSIMILE (509) 328-6205

29.     SCPAG directly and wholly owns Syngenta International AG ("SIAG"). SIAG is the "nerve center" through which SAG manages the entire Syngenta Group. SIAG employs the "Heads" of the Syngenta Group's CP and Seeds Divisions. SIAG also employs the "Heads" and senior staff of various global functions of the Syngenta Group, including Human Resources, Corporate Affairs, Global Operations, Research and Development, Legal and Taxes, and Finance. Virtually all of the Syngenta Group's global "Heads" and their senior staff are housed in the same office space in Basel, Switzerland.

30.     SAG is the indirect parent of SCPLLC through multiple layers of corporate ownership:

    a.  SAG directly and wholly owns Syngenta Participations AG;

    b.  Syngenta Participations AG directly and wholly owns Seeds JV C.V.;

    c.  Seeds JV C.V. directly and wholly owns Syngenta Corporation;

    d.  Syngenta Corporation directly and wholly owns Syngenta Seeds, LLC; and

    e.  Syngenta Seeds, LLC directly and wholly owns SCPLLC.

31.     Before SCPI was converted to SCPLLC, it was incorporated in Delaware, had its principal place of business in North Carolina, and had its own board of directors. SCPI's sales accounted for more than 47% of the sales for the entire Syngenta Group in 2019.

32.     SAG has purposefully organized the Syngenta Group, including SCPLLC, in such a way as to attempt to evade the authority of courts in jurisdictions in which it does substantial business. Although the formal legal structure of the Syngenta Group is designed to suggest otherwise, SAG in fact exercises an unusually high degree of control over its country-specific business units, including SCPLLC, through a "matrix management" system of functional reporting to global "Product Heads" in charge of the Syngenta Group's unincorporated Crop

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 10

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-4311 • FACSIMILE (509) 328-8305

EXHIBIT A
Page 31

1  Protection and Seeds Divisions, and to global "Functional Heads" in charge of human resources,

2  corporate affairs, global operations, research and development, legal and taxes, and finance.

3      33.    The lines of authority and control within the Syngenta Group do not follow its

4  formal legal structure, but instead follow this global "functional" management structure.  SAG

5  controls the actions of its far-flung subsidiaries, including SCPLLC, through this global

6  "functional" management structure.  SAG's board of directors has established a Syngenta

7  Executive Committee ("SEC"), which is responsible for the active leadership and the operative

8  management of the Syngenta Group, including SPLLC.  The SEC consists of the CEO and various

9  global Heads, which currently are:

10      a.  The Chief Executive Officer;

11      b.  Group General Counsel;

12      c.  The President of Global Crop Protection;

13      d.  The Chief Financial Officer;

14      e.  The President of Global Seeds; and

15      f.  The Head of Human Resources;

16      34.    SIAG employs all members of the Executive Committee.

17      35.    Global Syngenta Group corporate policies require SAG subsidiaries, including

18  SPLLC, to operate under the direction and control of the SEC and other unincorporated global

19  management teams.  SAG's board of directors meets five to six times a year.  In contrast, SCPI's

20  board of directors rarely met, either in person or by telephone, and met only a handful of times

21  over the last decade before SCPI became SCPLLC.

22      36.    Most, if not all, of the SCPI board's formal actions, including selecting and

23  removing SCPI officers, were taken by unanimous written consent pursuant to directions from the

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 11

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-4311 • FACSIMILE (509) 328-8205

1   SEC or other Syngenta Group global or regional managers that were delivered via e-mail to SCPI

2   board members.  Since SCPI became SCPLLC, decisions that are nominally made by the board or

3   managers of SCPLLC in fact continue to be directed by the SEC or other Syngenta Group global

4   or regional managers.  Similarly, Syngenta Seeds, Inc.'s board of directors appointed and removed

5   SCPI board members at the direction of the SEC or other Syngenta Group global or regional

6   managers.  Since SCPI became SCPLLC, the appointment and removal of the manager(s) of

7   SCPLLC continues to be directed by the SEC or other Syngenta Group global or regional

8   managers.

9       37.    The management structure of the Syngenta Group's CP Division, of which

10  SCPLLC is a part, is not defined by legal, corporate relationships, but by functional reporting

11  relationships that disregard corporate boundaries.  Atop the CP Division is the CP Leadership

12  Team (or another body with a different name but substantially the same composition and

13  functions), which includes the President of Global Crop Protection, the CP region Heads (including

14  SCPLLC President Vern Hawkins), and various global corporate function Heads.  The CP

15  Leadership Team meets bi-monthly to develop strategy for new products, markets, and operational

16  efficiencies and to monitor performance of the Syngenta Group's worldwide CP business.

17      38.    Under the CP Leadership Team are regional leadership teams, including the North

18  America Regional Leadership Team (or another body with a different name but substantially the

19  same composition and functions), which oversees the Syngenta Group's U.S. and Canadian CP

20  business (and, when previously known as the NAFTA Regional Leadership Team, also oversaw

21  the Syngenta Group's Mexican CP business).  The North America Regional Leadership Team is

22  chaired by SCPLLC's president and includes employees of SCPLLC and the Syngenta Group's

23

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 12

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-4311 - FACSIMILE (509) 326-8205

EXHIBIT A
Page 33

1   Canadian CP company (and when previously known as the NAFTA Regional Leadership Team,

2   also included employees of the Syngenta Group's Mexican CP company).

3       39.    The Syngenta Group's U.S. and Canadian CP companies, including SCPLLC,

4   report to the North America Regional Leadership Team, which reports the CP Leadership Team,

5   which reports to the SEC, which reports to SAG's board of directors.  Some members of the North

6   America Regional Leadership Team, including some SCPLLC employees, report or have in the

7   past reported not to their nominal superiors within the companies that employ them, but directly

8   to the Syngenta Group's global Heads.  Syngenta Group global Heads that supervise SCPLLC

9   employees participate and have in the past participated in the performance reviews of these

10   employees and in setting their compensation.

11       40.    The Syngenta Group's functional reporting lines have resulted in employees of

12   companies, including SCPLLC, reporting to officers of remote parent companies, officers of

13   affiliates with no corporate relationship other than through SAG, or officers of subsidiary

14   companies.  SCPLLC performs its functions according to its role in the CP Division structure:

    a.  CP Division development projects are proposed at the global level, ranked, and

15           funded at the global level after input from functional entities such as the CP

16           Leadership Team and the North America Regional Leadership Team, and given

17           final approval by the SEC;

    b.  New CP products are developed by certain Syngenta Group companies or

18           functional groups that manage and conduct research and development functions for

19           the entire CP Division;

    c.  These products are then tested by other Syngenta Group companies, including

20           SCPLLC, under the direction and supervision of the SEC, the CP Leadership Team,

21           or other Syngenta Group global managers;

    d.  Syngenta Group companies, including SCPLLC, do not contract with or

22           compensate each other for this testing;

23

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 13

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-4311 - FACSIMILE (509) 328-8205

e. Rather, the cost of such testing is included in the testing companies' operating budgets, which are established and approved by the Syngenta Group's global product development managers and the SEC;

f. If a product shows promise based on this testing and the potential markets for the product, either global or regional leaders (depending on whether the target market is global or regional), not individual Syngenta Group companies such as SCPLLC, decide whether to sell the product;

g. Decisions to sell the product must be approved by the SEC; and

h. The products that are sold all bear the same Syngenta trademark and logo.

41.    SCPLLC is subject to additional oversight and control by Syngenta Group global managers through a system of "reserved powers" established by SAG and applicable to all Syngenta Group companies. These "reserved powers" require Syngenta Group companies to seek approval for certain decisions from higher levels within the Syngenta Group's functional reporting structure. For example, although SAG permits Syngenta Group companies to handle small legal matters on their own, under the "reserved powers" system, SAG's Board of Directors must approve settlements of certain types of lawsuits against Syngenta Group companies, including SCPLLC, if their value exceeds an amount specified in the "reserved powers."

42.    Similarly, the appointments of senior managers at SCPLLC must be approved by higher levels than SCPLLC's own management, board of directors, or even its direct legal owner. Although SCPLLC takes the formal action necessary to appoint its own senior managers, this formal action is in fact merely the rubber-stamping of decisions that have already been made by the Syngenta Group's global management.

43.    Although SAG subsidiaries, including SCPLLC, pay lip service to legal formalities that give the appearance of authority to act independently, in practice many of their acts are directed or pre-approved by the Syngenta Group's global management. SAG and the global

COMPLAINT FOR DAMAGES FOR PERSONAL INJURIES AND WRONGFUL DEATH AND FOR DEMAND FOR JURY TRIAL - 14

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #785
SPOKANE, WASHINGTON 99201
(509) 252-1311 · FACSIMILE (509) 328-6205

1  management of the Syngenta Group restrict the authority of SCPLLC to act independently in areas

2  including:

    a.  Product development;

    b.  Product testing (among other things, SAG and the global management of the Syngenta Group require SCPLLC to use Syngenta Ltd.'s Central Toxicology Laboratory to design, perform, or oversee product safety testing that SCPLLC submits to the EPA in support of the registrations of paraquat and other pesticides);

    c.  Production;

    d.  Marketing;

    e.  Sales;

    f.  Human resources;

    g.  Communications and public affairs;

    h.  Corporate structure and ownership;

    i.  Asset sales and acquisitions;

    j.  Key appointments to boards, committees, and management positions;

    k.  Compensation packages;

    l.  Training for high-level positions; and

    m.  Finance (including day-to-day cash management) and tax.

    44.    Under the Syngenta Group's functional management system, global managers initiate, and the global Head of Human Resources oversees international assignments and compensation of managers employed by one Syngenta subsidiary to do temporary work for another Syngenta subsidiary in another country. This international assignment program aims, in part, to improve Syngenta Group-wide succession planning by developing corporate talent to make employees fit for higher positions within the global Syngenta Group of companies.  Under this international assignment program, at the instance of Syngenta Group global managers, SCPLLC

1    officers and employees have been "seconded" to work at other SAG subsidiaries, and officers and

2    employees of other Syngenta Group subsidiaries have been "seconded" to work at SCPLLC.

3        45.    The Syngenta Group's functional management system includes a central global

4    finance function—known as Syngenta Group Treasury—for the entire Syngenta Group. The

5    finances of all Syngenta Group companies are governed by a global treasury policy that

6    subordinates the financial interests of SAG's subsidiaries, including SCPLLC, to the interests of

7    the Syngenta Group as a whole. Under the Syngenta Group's global treasury policy, Syngenta

8    Group Treasury controls daily cash sweeps from subsidiaries such as SCPLLC, holds the cash on

9    account, and lends it to other subsidiaries that need liquidity. The Syngenta Group's global

10   treasury policy does not allow SAG subsidiaries such as SCPLLC to seek or obtain financing from

11   non-Syngenta entities without the approval of Syngenta Group Treasury. Syngenta Group

12   Treasury also decides whether SCPLLC will issue a dividend or distribution to its direct parent

13   company, and how much that dividend will be. SCPLLC's board or management approves

14   dividends and distributions mandated by Syngenta Group Treasury without any meaningful

15   deliberation.

16       46.    In 2011, a federal District Court held that SAG's unusually high degree of control

17   over SCPLLC made SCPLLC the agent or alter ego of SAG and therefore subjected SAG to

18   jurisdiction in the State of Illinois. *See City of Greenville, Ill. v. Syngenta Crop Protection, Inc.*,

19   830 F. Supp. 2d 550 (S.D. Ill. 2011). SAG continues to exercise the unusually high degree of

20   control over SCPLLC. SAG, through its agent or alter ego, SCPLLC, does substantial business in

21   the State of Washington, in the ways previously alleged as to SCPLLC.

22       **2.**    **Chevron Entities**

23       47.    Chevron Chemical Company ("Chevron Chemical") was a corporation organized

in 1928 under the laws of the State of Delaware. In 1997, Chevron Chemical was merged into

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 16

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-4311 - FACSIMILE (509) 328-8205

1   Chevron Chemical Company LLC ("Chevron Chemical LLC"), a limited liability company

2   organized under the laws of the State of Delaware. In the mid-2000s, Chevron Chemical LLC was

3   merged into or continued to operate under the same or similar ownership and management as

4   Defendant CP Chemical, a limited partnership organized and existing under the laws of the State

5   of Delaware with its principal place of business in The Woodlands, Texas.

6       48.    As a result of these various transactions, discussed *supra*, CP Chemical is a

7   successor by merger or continuation of business to its corporate predecessor Chevron Chemical

8   LLC; and CP Chemical is a successor by merger or continuation of business to its corporate

9   predecessor Chevron Chemical.

10      49.    CP Chemical is registered to do business in the State of Washington, and does

11  substantial business in the State of Washington, including Spokane County; among other things,

12  it owns and/or operates numerous filling stations in Spokane County.

13      50.    Defendant Chevron USA is a corporation organized and existing under the laws of

14  the State of Pennsylvania, with its principal place of business in the State of California. Chevron

15  USA is registered to do business in Washington. In the mid-2000s, Chevron USA entered into an

16  agreement in which it expressly assumed the liabilities of Chevron Chemical and Chevron

17  Chemical LLC arising from Chevron Chemical's then-discontinued agrichemical business, which

18  included the design, registration, manufacture, formulation, packaging, labeling, distribution,

19  marketing, and sale of paraquat products in the United States as alleged in this Complaint.

20      **3.    St. John Hardware & Implement Co., Inc.**

21      51.    Defendant St. John Hardware & Implement Co., Inc. is a Washington company.

22  During the relevant time period, St. John Hardware & Implement Co., Inc. maintained a retail

23  location in or around Fairfield, Washington, where it sold and/or mixed, *inter alia*, paraquat-

    containing herbicides.

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 17

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-4311 - FACSIMILE (509) 328-6205

EXHIBIT A
Page 38

**B.**    <u>Paraquat Manufacture, Distribution, and Sale</u>

52.    ICI, a legacy company of Syngenta, claims to have discovered the herbicidal properties of paraquat in 1955. The leading manufacturer of paraquat is Syngenta, which (as ICI) developed the active ingredient in paraquat in the early 1960s.

53.    ICI produced the first commercial paraquat formulation and registered it in England in 1962. Paraquat was first marketed in 1962 under the brand name Gramoxone. Paraquat first became commercially available for use in the United States in 1964.

54.    In or about 1964, ICI and Chevron Chemical entered into agreements regarding the licensing and distribution of paraquat ("the ICI-Chevron Chemical Agreements"). In or about 1971, ICI Americas became a party to the ICI-Chevron Chemical Agreements on the same terms as ICI. The ICI-Chevron Chemical Agreements were renewed or otherwise remained in effect until about 1986.

55.    In the ICI-Chevron Chemical Agreements:

- ICI and ICI Americas granted Chevron Chemical a license to their patents and technical information to permit Chevron Chemical to formulate or have formulated, use, and sell paraquat in the United States and to grant sub-licenses to others to do so;

- Chevron Chemical granted ICI and ICI Americas a license to its patents and technical information to permit ICI and ICI Americas to formulate or have formulated, use, and sell paraquat throughout the world and to grant sub-licenses to others to do so;

- ICI and ICI Americas and Chevron Chemical agreed to exchange patent and technical information regarding paraquat;

- ICI and ICI Americas granted Chevron Chemical exclusive rights to distribute and sell paraquat in the United States; and

- ICI and ICI Americas granted Chevron Chemical a license to distribute and sell paraquat in the U.S. under the ICI-trademarked brand name Gramoxone.

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 18

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-4311 - FACSIMILE (509) 328-6205

EXHIBIT A
Page 39

56.    ICI and ICI Americas and Chevron Chemical entered into the ICI-Chevron Chemical Agreements to divide the worldwide market for paraquat between them.  Under the ICI-Chevron Chemical Agreements and related agreements:

- Chevron Chemical distributed and sold paraquat in the U.S. and ICI and ICI Americas distributed and sold paraquat outside the United States;

- Both ICI and ICI Americas and Chevron Chemical distributed and sold paraquat under the ICI-trademarked brand name Gramoxone;

- ICI and ICI Americas and Chevron Chemical exchanged patent and technical information regarding paraquat;

- ICI and ICI Americas provided to Chevron Chemical health and safety and efficacy studies performed or procured by ICI's Central Toxicology Laboratory, which Chevron Chemical then submitted to the USDA and the EPA to secure and maintain the registration of paraquat for manufacture, formulation, distribution, and sale for use in the United States;

- ICI and ICI Americas manufactured and sold paraquat to Chevron Chemical that Chevron Chemical then distributed and sold in the United States, including in Washington, where Chevron Chemical registered paraquat products and marketed, advertised, and promoted them to Washington distributors, dealers, applicators, and farmers; and

- Chevron Chemical distributed and sold paraquat in the United States under the ICI-trademarked brand name Gramoxone and other names, including in Washington, where Chevron Chemical registered such products and marketed, advertised, and promoted them to Washington distributors, dealers, applicators, and farmers.

57.    SAG, its corporate predecessors, and others with whom they acted in concert have manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1964 through the present, and at all relevant times intended or expected their paraquat products to be distributed and sold in Washington, where they registered such products, and marketed, advertised, and promoted them to Washington distributors, dealers, applicators, and farmers.

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON  99201
(509) 252-4311 - FACSIMILE (509) 326-8205

58.    SAG, its corporate predecessors, and others with whom they acted in concert have submitted health and safety and efficacy studies to the USDA and the EPA to support the registration of paraquat for manufacture, formulation, distribution, and sale for use in the United States from approximately 1964 through the present.

59.    SCPLLC, its corporate predecessors, and others with whom they acted in concert have manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1971 through the present, and at all relevant times intended or expected their paraquat products to be distributed and sold in Washington, where they registered such products, and marketed, advertised, and promoted them to Washington distributors, dealers, applicators, and farmers.

60.    SCPLLC, its corporate predecessors, and others with whom they acted in concert have submitted health and safety and efficacy studies to the EPA to support the registration of paraquat for manufacture, formulation, distribution, and sale for use in the U.S. from about 1971 through the present.

61.    Chevron Chemical manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1964 through at least 1986, acting in concert with ICI and ICI Americas throughout this period, including in Washington, where Chevron Chemical registered such products, and used in Washington, and marketed, advertised, and promoted them to Washington distributors, dealers, applicators, and farmers.

## C.    Paraquat Usage

62.    Since 1964, paraquat has been used in the U.S. to kill broadleaf weeds and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops; to control weeds in orchards; and to desiccate (dry) plants before harvest.  Paraquat is commonly used multiple times per year on the same land, particularly when used to control weeds in orchards

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL – 20

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-0311 · FACSIMILE (509) 326-8205

1  or on farms with multiple crops planted on the same land within a single growing season or year.

2  Such use was intended and/or directed by Defendants, and/or was reasonably foreseeable.

3      63.    At all relevant times, paraquat that was manufactured, distributed, sold, and sprayed

4  or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with whom

5  they acted in concert was typically sold to end-users in the form of liquid concentrates (and less

6  commonly in the form of granular solids) designed to be diluted with water before or after loading

7  it into the tank of a sprayer and applied by spraying it onto target weeds.

8      64.    At all relevant times, concentrates containing paraquat that was manufactured,

9  distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate

10 predecessors, and others with whom they acted in concert typically were formulated with one or

11 more "surfactants" to increase the ability of the herbicide to stay in contact with the leaf, penetrate

12 the leaf's waxy surface, and enter into plant cells, and the accompanying instructions typically told

13 end-users to add a surfactant or crop oil (which as typically formulated contains a surfactant)

14 before use.

15     65.    At all relevant times, paraquat typically was applied with a knapsack sprayer, hand-

16 held sprayer, aircraft (i.e., crop duster), truck with attached pressurized tank, or tractor-drawn

17 pressurized tank, and such use was as intended or directed by Defendants or was reasonably

18 foreseeable.

19 **D.    Paraquat Exposure**

20     66.    At all relevant times, it was reasonably foreseeable that when paraquat was used in

21 the manner intended or directed or in a reasonably foreseeable manner, users of paraquat and

22 persons nearby would be exposed to paraquat while it was being mixed and loaded into the tanks

23 of sprayers, including as a result of spills, splashes, and leaks.

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 21

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #265
SPOKANE, WASHINGTON 99201
(509) 252-4311 - FACSIMILE (509) 328-8205

EXHIBIT A
Page 42

67. At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, persons who sprayed paraquat or were in or near areas where it was being or recently had been sprayed would be exposed to paraquat, including as a result of spray drift, the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind, and as a result of contact with sprayed plants.

68. At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of paraquat and persons nearby would be exposed to paraquat, including as a result of spills, splashes, and leaks, while equipment used to spray it was being emptied or cleaned, or clogged spray nozzles, lines, or valves were being cleared.

69. At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via absorption through or penetration of the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage was present.

70. At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via respiration into the lungs, including the deep parts of the lungs where respiration (gas exchange) occurred.

71. At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL – 22

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON  99201
(509) 252-1311 · FACSIMILE (509) 328-8205

72.     At all relevant times, it was reasonably foreseeable that paraquat that entered the human body via ingestion into the digestive tract could enter the enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract).

73.     At all relevant times, it was reasonably foreseeable that paraquat that entered the human body, whether via absorption, respiration, or ingestion, could enter the bloodstream.

74.     At all relevant times, it was reasonably foreseeable that paraquat that entered the bloodstream could enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier.

75.     At all relevant times, it was reasonably foreseeable that paraquat that entered the nose and nasal passages could enter the brain through the olfactory bulb (a part of the brain involved in the sense of smell), which is not protected by the blood-brain barrier.

**E.     Parkinson's Disease ("PD")**

76.     PD is progressive neurodegenerative disorder of the brain that affects primarily the motor system, the part of the central nervous system that controls movement. Scientists who study PD generally agree that fewer than 10% of all PD cases are caused by inherited genetic mutations alone, and that more than 90% are caused by a combination of environmental factors, genetic susceptibility, and the aging process.

**1.     Symptoms and treatment**

77.     The characteristic symptoms of PD are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance). PD's primary motor symptoms often result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred,

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 23

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-1311 - FACSIMILE (509) 328-8205

1    monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty

2    swallowing; and excess saliva and drooling caused by reduced swallowing movements.

3         78.    Non-motor symptoms—such as loss of or altered sense of smell; constipation; low

4    blood pressure on rising to stand; sleep disturbances; and depression—are present in most cases

5    of PD, often for years before any of the primary motor symptoms appear.

6         79.    There is currently no cure for PD.  No treatment will slow, stop, or reverse its

7    progression, and the treatments most-commonly prescribed for its motor symptoms tend to become

8    progressively less effective and to cause unwelcome side effects the longer they are used.

9    **2.    Pathophysiology**

10        80.    The selective degeneration and death of dopaminergic neurons (dopamine-

11    producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc") is

12    one of the primary pathophysiological hallmarks of PD.  Dopamine is a neurotransmitter (a

13    chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland

14    cell) that is critical to the brain's control of motor function (among other things).  The death of

15    dopaminergic neurons in the SNpc decreases the production of dopamine.

16        81.    Once dopaminergic neurons die, they are not replaced. When enough dopaminergic

17    neurons have died, dopamine production falls below the level the brain requires for proper control

18    of motor function, resulting in the motor symptoms of PD. The presence of Lewy bodies (insoluble

19    aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in

20    the SNpc is another of the primary pathophysiological hallmarks of PD.  Dopaminergic neurons

21    are particularly susceptible to oxidative stress, a disturbance in the normal balance between

22    oxidants present in cells and cells' antioxidant defenses.  Scientists who study PD generally agree

23    that oxidative stress is a major factor in—if not the precipitating cause of—the degeneration and

    death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 24

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-4311 · FACSIMILE (509) 328-8205

EXHIBIT A
Page 45

1  dopaminergic neurons that are the primary pathophysiological hallmarks of PD.

2  **F.    Paraquat's Toxicity**

3      82.    Paraquat is highly toxic to both plants and animals. Paraquat injures and kills plants

4  by creating oxidative stress that causes or contributes to cause the degeneration and death of plant

5  cells. Paraquat injures and kills humans and other animals by creating oxidative stress that causes

6  or contributes to cause the degeneration and death of animal cells. Paraquat creates oxidative

7  stress in the cells of plants and animals because of "redox properties" that are inherent in its

8  chemical composition and structure: it is a strong oxidant, and it readily undergoes "redox cycling"

9  in the presence of molecular oxygen, which is plentiful in living cells.

10      83.    The redox cycling of paraquat in living cells interferes with cellular functions that

11  are necessary to sustain life—photosynthesis in the case of plant cells and cellular respiration in

12  the case of animal cells. The redox cycling of paraquat in living cells creates a "reactive oxygen

13  species" known as superoxide radical, an extremely reactive molecule that can initiate a cascading

14  series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins,

15  and nucleic acids—molecules that are essential components of the structures and functions of

16  living cells. Because the redox cycling of paraquat can repeat indefinitely in the conditions

17  typically present in living cells, a single molecule of paraquat can trigger the production of

18  countless molecules of destructive superoxide radical. Significantly, paraquat's redox properties

19  have been known since at least the 1930s.

20      84.    That paraquat is toxic to the cells of plants and animals because it creates oxidative

21  stress through redox cycling has been known since at least the 1960s. The surfactants added to the

22  paraquat that was manufactured, distributed, and sold by Defendants, Defendants' corporate

23  predecessors, and others with whom they acted in concert were likely to increase paraquat's

toxicity to humans by increasing its ability to stay in contact with or penetrate the skin, mucous

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 25

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-0311 - FACSIMILE (509) 325-8205

1    membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages,

2    trachea, and conducting airways, the lungs, and the gastrointestinal tract.

3    **G.    Paraquat and Parkinson's Disease**

4         85.    The same redox properties that make paraquat toxic to plant cells and other types

5    of animal cells make it toxic to dopaminergic neurons—paraquat is a strong oxidant that interferes

6    with the function of, damages, and ultimately kills dopaminergic neurons by creating oxidative

7    stress through redox cycling.  Although PD is not known to occur naturally in any species other

8    than humans, PD research is often performed using "animal models," in which scientists artificially

9    produce in laboratory animals conditions that show features of PD.  Paraquat is one of only a

10   handful of toxins that scientists use to produce animal models of PD.

11        86.    In animal models of PD, hundreds of studies involving various routes of exposure

12   have found that paraquat creates oxidative stress that results in the degeneration and death of

13   dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human PD,

14   and motor deficits and behavioral changes consistent with those commonly seen in human PD.

15   Hundreds of in vitro studies have found that paraquat creates oxidative stress that results in the

16   degeneration and death of dopaminergic neurons (and many other types of animal cells).

17   Additionally, many epidemiological studies (studies of the patterns and causes of disease in

18   defined populations) have found an association between paraquat exposure and PD, including

19   multiple studies finding a two- to five-fold or greater increase in the risk of PD in populations with

20   occupational exposure to paraquat compared to populations without such exposure.

21   **H.    Paraquat Regulation**

22        87.    The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §

23   136 et seq., which regulates the distribution, sale, and use of pesticides within the United States,

     requires that pesticides be registered with the EPA prior to their distribution, sale, or use, except

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL – 26

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-4311 - FACSIMILE (509) 328-6205

as described by FIFRA. 7 U.S.C. 136a(a). As part of the pesticide registration process, the EPA requires, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

88. As a general rule, FIFRA requires registrants to perform health and safety testing of pesticides. FIFRA does not, however, require the EPA to perform health and safety testing of pesticides itself, and the EPA generally does not perform such testing.

89. The EPA registers (or re-registers) a pesticide if it believes, based largely on studies and data submitted by the registrant, that:

a. its composition is such as to warrant the proposed claims for it, 7 U.S.C. § 136a(c)(5)(A);

b. its labeling and other material required to be submitted comply with the requirements of FIFRA, 7 U.S.C. § 136a(c)(5)(B);

c. it will perform its intended function without unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(C); and

d. when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(D).

90. FIFRA defines "unreasonable adverse effects on the environment" as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). Under FIFRA, "[a]s long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2). However, FIFRA further provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(f)(2).

COMPLAINT FOR DAMAGES FOR PERSONAL INJURIES AND WRONGFUL DEATH AND FOR DEMAND FOR JURY TRIAL - 27

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE 0285
SPOKANE, WASHINGTON 99201
(509) 252-0311 - FACSIMILE (509) 328-8205

EXHIBIT A
Page 48

91.    The distribution or sale of a pesticide that is misbranded is an offense under FIFRA, which provides in relevant part that "it shall be unlawful for any person in any State to distribute or sell to any person . . . any pesticide which is . . . misbranded." 7 U.S.C. § 136j(a)(1)(E).  A pesticide is misbranded under FIFRA if, among other things:

    a.  its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients that is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A);

    b.  the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under Section 136a(d) of the title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or

    c.  the label does not contain a warning or caution statement that may be necessary and if complied with, together with any requirements imposed under section 136a(d) of the title, is adequate to protect health and the environment," 7 U.S.C. § 136(q)(1)(G).

92.    Plaintiff does not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA. Accordingly, any allegation in this complaint that a Defendant breached a duty to provide adequate directions for the use of paraquat or warnings about paraquat, breached a duty to provide adequate packaging for paraquat, or concealed, suppressed, or omitted to disclose any material fact about paraquat or engaged in any unfair or deceptive practice regarding paraquat, that allegation is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice, having rendered the paraquat "misbranded" under FIFRA; however, Plaintiff brings claims and seeks relief in this action only under state law, and do not bring any claims or seek any relief in this action under FIFRA.

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #295
SPOKANE, WASHINGTON 99201
(509) 252-1311 – FACSIMILE (509) 328-8205

I.    **Shell Belsby's Paraquat Exposure**

93.    Plaintiff Mary Belsby, Personal Representative of the Estate of Shell Belsby, brings this action on behalf of the Estate and the Estate's beneficiaries. Shell Belsby (DOB: 08/17/1944; SSN: ####-##-8559) was exposed to Paraquat and/or paraquat-containing products, which had been manufactured, supplied, produced, mixed and/or placed into the stream of commerce by Defendants.

94.    More specifically, beginning in or around 1968 and continuing up through approximately 1976, Shell Belsby directly handled paraquat and/or paraquat-containing products and sprayed these products using an open cab tractor while working on the family farm. This paraquat and/or paraquat-containing product was purchased at St. John Hardware & Implement Co., Inc. in or around Fairfield, Washington, and designed, manufactured, distributed and/or sold by Chevron U.S.A, CP Chemical, Syngenta and/or Syngenta AG.

95.    As a direct and proximate result of this exposure, Shell Belsby developed Parkinson's disease ("PD"), which he was diagnosed with on or about March 2017. After living with the devastating effects of PD for approximately 4 years, on June 21, 2021, Shell Belsby died. The cause of death listed on his death certificate is Parkinson's disease.

96.    Critically,

- Shell Belsby had never been told by a doctor that his Parkinson's disease was or could have been caused by exposure to paraquat.

- Shell Belsby had never read or heard of any articles in newspapers, scientific journals, or other publications that associated Parkinson's disease with paraquat.

- Shell Belsby had never read or heard of any lawsuit alleging that paraquat causes Parkinson's disease until shortly before his death.

97.    Moreover, at no time when using paraquat himself was Shell Belsby aware that exposure to paraquat could cause any latent injury, including any neurological injury or

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 29

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-4311 - FACSIMILE (509) 328-6205

EXHIBIT A
Page 50

1    Parkinson's disease, or that any precautions were necessary to prevent any latent injury that could

2    be caused by exposure to paraquat.

3         98.    The paraquat to which Shell Belsby was exposed was sold and used in Washington,

4    and was manufactured, distributed, and, on information and belief, sold by one or more of the

5    Defendants and their corporate predecessors and others with whom they acted in concert intending

6    or expecting that it would be sold and used in Washington.

7         99.    On information and belief, Shell Belsby was exposed to paraquat:

8    • manufactured, distributed, and sold at different times as to each Defendant, its
     corporate predecessors, and others with whom they acted in concert, and not
9    necessarily throughout the entire period of his exposure as to any particular
     Defendant, its corporate predecessors, and others with whom they acted in concert;
10

11   • that was sold and used in Washington, and was manufactured, distributed, and sold
     by SCPLLC, its corporate predecessors, and others with whom they acted in
     concert, including Chevron Chemical, intending, or expecting that it would be sold
12   and used in Washington;

13   • that was sold and used in Washington, and was manufactured, distributed, and sold
     by SAG, its corporate predecessors, and others with whom they acted in concert,
14   including Chevron Chemical, intending, or expecting that it would be sold and used
     in Washington;
15

16   • that was sold and used in Washington, and was manufactured, distributed, and sold
     by Chevron Chemical, acting in concert with ICI and ICI Americas, intending or
     expecting that it would be sold and used in Washington; and
17

18   • that was sold and used in Washington and was distributed and sold by St. John
     Hardware & Implement Co., Inc.

19                              IV.    CLAIMS

20        100.   Plaintiff claims liability against Defendants based upon the theories of common law

21   negligence; strict product liability, negligence, and breach of express and implied warranties under

22   the Washington Product Liability Act (WPLA), RCW 7.72 *et seq*.; strict product liability under

23   Section 402A and 402B of the Restatement of Torts; wrongful death; and any other applicable

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 30

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-4311 - FACSIMILE (509) 326-0205

EXHIBIT A
Page 51

1    theory of liability. The liability-creating conduct of Defendants consisted of negligent and unsafe

2    design; failure to inspect, test, warn, instruct, monitor, and/or recall; failure to substitute safe

3    products; marketing or installing unreasonably dangerous or extra-hazardous and/or defective

4    products; marketing or installing products not reasonably safe as designed; and marketing or

5    installing products not reasonably safe for lack of adequate warning and marketing or installing

6    products with misrepresentations of product safety.

7                        **COUNT ONE: NEGLIGENCE**

8                            **(Against All Defendants)**

9        101.    Plaintiff repeats and realleges paragraphs 1-100 as though fully set forth herein.

10       102.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors,

11   and others with whom they acted in concert were engaged in the business of designing,

12   manufacturing, distributing, and selling herbicides, and designed, manufactured, distributed, and

13   sold paraquat.

14       103.    The paraquat that Defendants, Defendants' corporate predecessors, and others with

15   whom they acted in concert designed, manufactured, distributed, and sold and to which Shell

16   Belsby was exposed was used in the intended and directed manner or a reasonably foreseeable

17   manner.

18       104.    At all times relevant to this claim, in designing, manufacturing, packaging, labeling,

19   distributing, and selling paraquat, and in acting in concert with others who did so, Defendants,

20   Defendants' corporate predecessors, and others with whom they acted in concert owed a duty to

21   exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable

22   could be exposed to it, including Shell Belsby.

23       105.    When Defendants, Defendants' corporate predecessors, and others with whom they

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-1311 - FACSIMILE (509) 328-8205

1  acted in concert designed, manufactured, packaged, labeled, distributed, and sold the paraquat to

2  which Shell Belsby was exposed, it was reasonably foreseeable, and Defendants, Defendants'

3  corporate predecessors, and others with whom they acted in concert knew or in the exercise of

4  ordinary case should have known, that when paraquat was used in the intended and directed

5  manner or a reasonably foreseeable manner:

6       a.  it was designed, manufactured, formulated, and packaged such that it was likely
7           to be inhaled, ingested, and absorbed into the bodies of persons who used it, who
            were nearby while it was being used, or who entered fields or orchards where it
8           had been sprayed or areas near where it had been sprayed; and

9       b.  when inhaled, ingested, or absorbed into the bodies of persons who used it, who
            were nearby while it was being used, or who entered fields or orchards where it
10          had been sprayed or areas near where it had been sprayed, it was likely to cause or
            contribute to cause latent neurological damage that was both permanent and
11          cumulative, and repeated exposures were likely to cause or contribute to cause
            clinically significant neurodegenerative disease, including PD, to develop long
12          after exposure.

13     106.   In breach of the aforementioned duty to Shell Belsby, Defendants, Defendants'

14 corporate predecessors, and others with whom they acted in concert negligently:

15     a.  failed to design, manufacture, formulate, and package paraquat to make it unlikely
            to be inhaled, ingested, and absorbed into the bodies of persons who used it, who
            were nearby while it was being used, or who entered fields or orchards where it had
16          been sprayed or areas near where it had been sprayed;

17     b.  designed, manufactured, and formulated paraquat such that when inhaled, ingested,
            or absorbed into the bodies of persons who used it, who were nearby while it was
18          being used, or who entered fields or orchards where it had been sprayed or areas
            near where it had been sprayed, it was likely to cause or contribute to cause latent
19          neurological damage that was both permanent and cumulative, and repeated
            exposures were likely to cause or contribute to cause clinically significant
20          neurodegenerative disease, including PD, to develop long after exposure;

21     c.  failed to perform adequate testing to determine the extent to which exposure to
            paraquat was likely to occur through inhalation, ingestion, and absorption into the
22          bodies of persons who used it, who were nearby while it was being used, or who
            entered fields or orchards where it had been sprayed or areas near where it had been
23          sprayed;

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-1311 • FACSIMILE (509) 328-8205

d.  failed to perform adequate testing to determine the extent to which paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

e.  failed to perform adequate testing to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

f.  failed to perform adequate testing to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

g.  failed to direct that paraquat be used in a manner that would have made it unlikely to have been inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

h.  failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

107.  As a direct and proximate result of the negligence of Defendants, their corporate predecessors, and others with whom they acted in concert, Shell Belsby developed PD; suffered severe and permanent physical pain, mental anguish, and disability, and continued to do so for the remainder of his life; suffered the loss of a normal life and continued to do so for the remainder of his life; lost income that he otherwise would have earned; and incurred expenses for necessary

COMPLAINT FOR DAMAGES FOR PERSONAL INJURIES AND WRONGFUL DEATH AND FOR DEMAND FOR JURY TRIAL - 33

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #245
SPOKANE, WASHINGTON 99201
(509) 252-4311 - FACSIMILE (509) 228-8205

EXHIBIT A
Page 54

1  medical treatment until his death.

2  **COUNT TWO: STRICT PRODUCT LIABILITY – DESIGN DEFECT**

3  **(Against Defendants Chevron USA, CP Chemical, SCPLLC and SAG)**

4      108.    Plaintiff repeats and realleges paragraphs 1-107 as though fully set forth herein.

5      109.    At all relevant times, Defendants, Chevron USA, CP Chemical, SCPLLC and SAG,

6  their corporate predecessors, and others with whom they acted in concert were engaged in the U.S.

7  paraquat business.

8      110.    At all relevant times, Defendants Chevron USA, CP Chemical, SCPLLC and SAG,

9  their corporate predecessors, and others with whom they acted in concert were engaged in the

10  business of designing, manufacturing, distributing, and selling pesticides, and designed,

11  manufactured, distributed, and sold paraquat.

12      111.    The paraquat that Defendants Chevron USA, CP Chemical, SCPLLC and SAG,

13  their corporate predecessors, and others with whom they acted in concert designed, manufactured,

14  distributed, and sold and to which Shell Belsby was exposed was in a defective condition that

15  made it unreasonably dangerous, in that when used in the intended and directed manner or a

16  reasonably foreseeable manner:

17      a.  it was designed, manufactured, formulated, and packaged such that it was likely to
18          be inhaled, ingested, and absorbed into the bodies of persons who used it, who were
            nearby while it was being used, or who entered fields or orchards where it had been
            sprayed or areas near where it had been sprayed; and
19
20      b.  when inhaled, ingested, or absorbed into the bodies of persons who used it, who
            were nearby while it was being used, or who entered fields or orchards where it had
21          been sprayed or areas near where it had been sprayed, it was likely to cause or
            contribute to cause latent neurological damage that was both permanent and
22          cumulative, and repeated exposures were likely to cause or contribute to cause
            clinically significant neurodegenerative disease, including PD, to develop long
            after exposure.
23
        112.    This defective condition existed in the paraquat that Defendants Chevron USA, CP

1   Chemical, SCPLLC and SAG, their corporate predecessors, and others with whom they acted in

2   concert designed, manufactured, distributed, and sold and to which Shell Belsby was exposed

3   when it left the control of Defendants Chevron USA, CP Chemical, SCPLLC and SAG, their

4   corporate predecessors, and others with whom they acted in concert and was placed into the stream

5   of commerce.

6        113.   As a result of this defective condition, the paraquat that Defendants Chevron USA,

7   CP Chemical, SCPLLC and SAG, their corporate predecessors, and others with whom they acted

8   in concert designed, manufactured, distributed, and sold and to which Shell Belsby was exposed

9   either failed to perform in the manner reasonably to be expected in light of its nature and intended

10  function, or the magnitude of the dangers outweighed its utility.  The paraquat that Defendants,

11  Defendants' corporate predecessors, and others with whom they acted in concert designed,

12  manufactured, distributed, and sold and to which Shell Belsby was exposed was used in the

13  intended and directed manner or a reasonably foreseeable manner.

14       114.   As a direct and proximate result of this defective condition created by Defendants,

15  their corporate predecessors, and others with whom they acted in concert, Shell Belsby developed

16  PD; suffered severe and permanent physical pain, mental anguish, and disability, and continued to

17  do so for the remainder of his life; suffered the loss of a normal life and continued to do so for the

18  remainder of his life; lost income that he otherwise would have earned; and incurred expenses for

19  necessary medical treatment until his death.

20  **COUNT THREE: STRICT PRODUCT LIABILITY: FAILURE TO WARN**

21       **(Against Defendants Chevron USA, CP Chemical, SCPLLC and SAG)**

22       115.   Plaintiff repeats and realleges paragraphs 1-114 as though fully set forth herein.

23       116.   At all times relevant to this claim, Defendants Chevron USA, CP Chemical,

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 35

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-4311 - FACSIMILE (509) 328-8205

1    SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert were

2    engaged in the business of designing, manufacturing, distributing, and selling pesticides, and

3    designed, manufactured, distributed, and sold paraquat.

4        117.    When Defendants Chevron USA, CP Chemical, SCPLLC and SAG, their corporate

5    predecessors, and others with whom they acted in concert designed, manufactured, distributed,

6    and sold the paraquat to which Shell Belsby was exposed, Defendants Chevron USA, CP

7    Chemical, SCPLLC and SAG, their corporate predecessors, and others with whom they acted in

8    concert knew or in the exercise of ordinary care should have known that when used in the intended

9    and directed manner or a reasonably foreseeable manner:

10       a.   it was designed, manufactured, formulated, and packaged such that it was likely to
11           be inhaled, ingested, and absorbed into the bodies of persons who used it, who were
             nearby while it was being used, or who entered fields or orchards where it had been
12           sprayed or areas near where it had been sprayed; and

13       b.   when inhaled, ingested, or absorbed into the bodies of persons who used it, who
             were nearby while it was being used, or who entered fields or orchards where it had
14           been sprayed or areas near where it had been sprayed, it was likely to cause or
             contribute to cause latent neurological damage that was both permanent and
15           cumulative, and repeated exposures were likely to cause or contribute to cause
             clinically significant neurodegenerative disease, including PD, to develop long
16           after exposure.

17       118.    The paraquat that Defendants Chevron USA, CP Chemical, SCPLLC and SAG,

18   their corporate predecessors, and others with whom they acted in concert designed, manufactured,

19   distributed, and sold, and to which Shell Belsby was exposed, was in a defective condition that

20   made it unreasonably dangerous when it was used in the intended and directed manner or a

21   reasonably foreseeable manner, in that:

22       a.   it was not accompanied by directions for use that would have made it unlikely to
             be inhaled, ingested, and absorbed into the bodies of persons who used it, who were
23           nearby while it was being used, or who entered fields or orchards where it had been
             sprayed or areas near where it had been sprayed; and

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 232-4311 • FACSIMILE (509) 328-8205

b. it was not accompanied by a warning that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and that repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

119.    This defective condition existed in the paraquat that Defendants Chevron USA, CP Chemical, SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold, and to which Shell Belsby was exposed when it left the control of Defendants Chevron USA, CP Chemical, SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert and was placed into the stream of commerce.

120.    As a result of this defective condition, the paraquat that Defendants Chevron USA, CP Chemical, SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Shell Belsby was exposed either failed to perform in the manner reasonably to be expected in light of its nature and intended function, or the magnitude of the dangers outweighed its utility.

121.    The paraquat that Defendants Chevron USA, CP Chemical, SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Shell Belsby was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

122.    As a direct and proximate result of the lack of adequate directions for the use of and warnings about the dangers of the paraquat manufactured, distributed and sold by Defendants Chevron USA, CP Chemical, SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert, Shell Belsby developed PD; suffered severe and permanent physical

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 37

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-4311 - FACSIMILE (509) 328-6205

1    pain, mental anguish, and disability, and continued to do so for the remainder of his life; suffered

2    the loss of a normal life and continued to do so for the remainder of his life; lost income that he

3    otherwise would have earned; and incurred expenses for necessary medical treatment until his

4    death.

5    <u>**COUNT FOUR: BREACH OF EXPRESS AND IMPLIED WARRANTIES**</u>

6    **(Against All Defendants)**

7        123.    Plaintiff repeats and realleges paragraphs 1-122 as though fully set forth herein.

8        124.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors,

9    and others with whom they acted in concert were engaged in the business of designing,

10    manufacturing, distributing, and selling paraquat and other restricted-use pesticides and

11    themselves out as having knowledge or skill regarding paraquat and other restricted-use pesticides.

12        125.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors,

13    and others with whom they acted in concert designed, manufactured, distributed, and sold

14    paraquat.

15        126.    At the time of each sale of paraquat to which Shell Belsby was exposed,

16    Defendants, Defendants' corporate predecessors, and others with whom they acted in concert

17    expressly and impliedly warranted that it was of merchantable quality, including that it was fit for

18    the ordinary purposes for which such goods were used.

19        127.    Defendants, Defendants' corporate predecessors, and others with whom they acted

20    in concert breached this warranty regarding each sale of paraquat to which Shell Belsby was

21    exposed, in that it was not of merchantable quality because it was not fit for the ordinary purposes

22    for which such goods were used, and in particular:

23            a.    it was designed, manufactured, formulated, and packaged such that it was likely to
               be inhaled, ingested, and absorbed into the bodies of persons who used it, who were

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 38

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #283
SPOKANE, WASHINGTON 99201
(509) 252-0311 - FACSIMILE (509) 328-8205

EXHIBIT A
Page 59

nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b. when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

128.    As a direct and proximate result of these breaches of express and implied warranties by Defendants, their corporate predecessors, and others with whom they acted in concert, Shell Belsby developed PD; suffered severe and permanent physical pain, mental anguish, and disability for the remainder of his life; suffered the loss of a normal life for the remainder of his life; lost income that he otherwise would have earned; and incurred expenses for necessary medical treatment until his death.

## V.    DAMAGES FOR WRONGFUL DEATH

### (Against All Defendants)

129.    Plaintiff repeats and realleges paragraphs 1-128 as though fully set forth herein.

130.    Defendants' negligent, grossly negligent and/or reckless acts and/or omissions were a proximate cause of the wrongful death of Shell Belsby.

131.    As a proximate cause of Defendants' negligence, gross negligence and/or recklessness, Plaintiff and the statutory beneficiaries have sustained economic and non-economic damages, including those allowed by RCW 4.20 *et seq.*, and which include without limitation, past and future medical expense, past and future lost income or earning capacity, loss of consortium, emotional distress, grief, loss of enjoyment of life, inconvenience, mental anguish, the destruction of the spousal and child-parent relationships, and pain and suffering and in amounts to be proven at trial.

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 39

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-1311 - FACSIMILE (509) 328-6205

132.    As a proximate cause of Defendants' wrongful acts and/or omissions, the Estate of Shell Belsby has sustained damages including, without limitation, the loss of the accumulation of income and incurred medical, funeral, and burial expenses, and the conscious pain, suffering, anxiety and fear of impending death experienced by the decedent, in such amounts as will be proven at the time of trial together with interest thereon at the statutory rate from the date of death or the date the expenses were incurred.

## VI.    REQUESTED RELIEF

133.    Plaintiff repeats and realleges paragraphs 1-132 as though fully set forth herein.

134.    As a proximate result of Defendants' negligence and/or product liability and/or other basis of liability, Shell Belsby sustained pain, suffering, and disability in an amount not now known, but which will be proven at trial. The Estate of Shell Belsby is entitled to damages for his physical pain and suffering, mental anguish, anxiety, physical impairment, disability, disfigurement, loss of enjoyment of life, his reasonable and necessary medical bills and other expenses incurred, and his wrongful death as a result of his Parkinson's disease. Shell Belsby sustained medical expenses and economic losses in an amount to be proven at trial.

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

    a.  For all damages sustained by the Shell Belsby, including the Estate and all statutorily recognized beneficiaries, in amounts proven at trial, including without limitation, all past and future economic and non-economic damages allowed by RCW 4.20 *et seq.* and the common law, including the loss of the accumulation of income, incurred medical, funeral, and burial expenses, loss of consortium, destruction of the spousal relationship, and the conscious pain, suffering, anxiety and fear of impending death experienced by the decedent;

    b.  Interest calculated at the maximum amount allowable by law, including pre- and post-judgment interest;

    c.  A reasonable attorney's fee as allowed by law;

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 40

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-4311 - FACSIMILE (509) 328-6205

d. Costs and disbursements pursuant to statute;

e. Other damages contemplated by law in amounts to be determined at trial; and

f. Such other relief as this Court may deem just and equitable.

DATED this 12th day of October 2021.

LAW OFFICE OF ANDREW S. BIVIANO, PLLC

Andrew S. Biviano, WSBA No. 38086
1312 N. Monroe Street, Suite #285
Spokane, WA 99201
Phone: (509) 252-4311
Fax: (509) 328-8205

WAGSTAFF LAW FIRM
Aimee H. Wagstaff
940 N. Lincoln Street
Denver, CO 80203
Phone: (303) 376-6360
*Pro hac vice* admission pending

Counsel for Plaintiff

COMPLAINT FOR DAMAGES FOR PERSONAL
INJURIES AND WRONGFUL DEATH AND FOR
DEMAND FOR JURY TRIAL - 41

LAW OFFICE OF ANDREW S. BIVIANO, PLLC
1312 N. MONROE STREET, SUITE #285
SPOKANE, WASHINGTON 99201
(509) 252-4311 - FACSIMILE (509) 328-8205

EXHIBIT A
Page 62